**STATE of Missouri, Respondent,**

v.

**Edward Ulysses GREGORY, Appellant.**

**No. 52084.**

Supreme Court of Missouri,
Division No. 2.

Oct. 10, 1966.

J. Whitfield Moody, J. Arnot Hill, Kansas City, for appellant.

Norman H. Anderson, Atty. Gen., Jefferson City, Eugene E. Reeves, Sp. Asst. Atty. Gen., Caruthersville, for respondent.

EAGER, Presiding Judge.

Defendant was charged by information with first degree robbery and a prior felony conviction. A jury found him guilty, and the court found from the evidence that the Habitual Criminal Act was applicable; it imposed a sentence of ten years, later reduced to eight. By a timely motion for new trial counsel properly raised the question which now constitutes the issue on this appeal. Defendant was and is most effectively represented by a member of the staff of the Public Defender of Jackson County.

The evidence here must be considered in the light most favorable to the jury's verdict and inferences to the contrary must be disregarded. State v. Watson, Mo., 350 S.W.2d 763, 766. So considered, the evidence disclosed the facts which we now relate. On the evening of September 10, 1965, one Kelly Breshears was in sole charge of a filling station of the Martin Oil Company located at the corner of Truman Road and Park Avenue in Kansas City. Very shortly after 8:00 p. m. a colored man entered the building, went to the rest room and came out; he then "walked back out around the building, and then two more come down the street," and came in. At about that same time the first man re-entered, sat down on a little bench near the front window and carried on some conversation with one or both of the two men. Breshears had been busy with cars outside, stepping in occasionally, but when he finished he came in to see what the men wanted. After some rather immaterial preliminary conversation, and as Breshears turned to hand a package of cigarettes to one of the two who entered together the other one (of the two) stuck the barrel of a small chrome-plated revolver in his ear or just under his ear, pushed his "head back around," told him to shut up and ordered him into the back room. The man on the bench was, at that particular time, only four to six feet away to the side of Breshears, and he did not leave when these things occurred. Without going into all the details, the two men conducted and more or less pushed Breshears into the back room, proceeded to take all the money he had, including some change from his coin changer, and forced him to give them the key to the safe. After leaving him on the floor in that room with a raincoat over his head, and with threats to kill him if he did not so remain for five minutes, the men took all the money from the safe, including some rolls of coins.

Mr. Charles Dixon, a customer whose gas tank Breshears had partly filled and who had completed the job himself, started in from the pump area to pay for his gas; a Negro man confronted him and said in a rather low voice, "I'll take your money"; Dixon pretended not to hear him, the direction was repeated in a louder voice and Dixon gave the man a five dollar bill, getting some change back. He asked for his "trading stamps," was told "We don't have any," and he then began to think the transaction was "funny"; he started into the station and was almost run over by two Negro men who ran out. The latter two started around the corner, one apparently having money in his hand, and Dixon had started back to his car to leave, when one of the two returned, pointed a small chrome revolver at him, and took his billfold.

Thereupon, the three left together running around the corner and south on Park Avenue. Dixon had a considerable sum of money in his billfold; as indicated later, the billfold was recovered and, according to Dixon, a part of the money also. Dixon was unable to identify any of the three, since it was after dark and the station was not very well lighted. The robbery of Dixon is not directly involved in this case, but is merely one of the attendant circumstances.

At the trial Breshears positively identified the defendant as the man who came in the station first and went to the rest room, returned when the other two entered, talked with them, and sat on the bench. He further testified that defendant then had on tinted glasses, that a man later identified as Thomas was the one who held the gun on him, and that Thomas did not have on glasses. The robbery occurred at a few minutes after 8:00 p. m. Dixon testified that the man who took his billfold was wearing glasses.

At 8:14 p. m. a city patrolman operating a speed check at 18th and Euclid (approximately four blocks from the scene of the robbery) timed a car at a speed in excess of the limit and gave chase. He stopped it two blocks away at 18th and Vine. The car contained three Negro men. The driver got out and showed his driver's license; he proved to be this defendant. At about that moment a report of the robbery was broadcast on the police radio with tentative descriptions, and the officer, hearing it then and there, tentatively identified the occupants of the car as suspects. At that time the front seat passenger picked up something from the seat, jumped out and ran down Vine Street. The officer could see something white in his hand, like a cloth or bag; he was unable to chase the man, who thus escaped. The officer called for assistance and other officers arrived. The officers then conducted a "frisk" search of the remaining two men for weapons; they searched the car and found at least two rolls of small coins on the floor in front

on the passenger's side, some loose change, a chrome-plated, loaded revolver stuck under the cushion of the rear seat, and a hunting knife and sheath. A roll of pennies so found was stamped with the name of "Martin Oil Company." Both of the men denied participation in the robbery; one of them, according to the police, then had on dark glasses. Various articles so found were identified at the trial. The arrest was made about six blocks from the scene of the holdup. In the "frisk" search one of the officers felt (as he so testified) a billfold in *each* hip pocket of Gregory, the defendant, a fact which he considered most unusual; that witness was recalled the next morning and was shown the police report (which he had prepared) stating that Thomas, the other man, had two billfolds. However, the witness again stated that, according to his recollection, it was this defendant who had them. Nothing was taken from the men's persons in the "frisk" search; they were taken from the scene of the arrest in the "paddy-wagon," and after they arrived at the police station Dixon's billfold was found on the floor of the "wagon" under a seat. Thomas, who was defendant's witness, denied ever having it and denied seeing it except at the police station.

The defendant did not testify; Thomas, who had pleaded guilty and received a sentence of eight years, did testify on behalf of the defendant. His testimony is somewhat hard to follow and, since there was a guilty verdict, we need not recite it in any detail. The gist of it was: that he and two other men committed the robbery; that he, Thomas, used the gun; that defendant was not one of the three, and was not even there; that after leaving the scene and running for a while they saw defendant (whom he knew) driving a car and stopped him; that he and the associate whom he knew as Robert Johnson got in and rode with defendant; that the one known as "Red" was a little behind and did not make it to the car; that Johnson was the one who jumped out of the car and ran

and that he had the money; that he, Thomas, was not wearing glasses; that when arrested he had only one billfold, and that he put the pistol under the rear seat. Thomas had at least two prior felony convictions. While Thomas was on the witness stand the prosecutor brought in a man and asked Thomas if that man was "Red." Thomas said that he was.

In rebuttal the State produced one Robert E. Kingyon who testified: that he was sometimes called "Red" and other nicknames; that he did not take part in the robbery and was not at the filling station that night; that he was driving his cousin's car at an unstated time on that evening, picked up the defendant, parked the car at 16th and Olive and let defendant out; that later he found that the car was missing, and he next saw it at the scene of the arrest, about to be towed away; that the police took him to the station, too. That evidence is not legally material to our issue, whatever its effect may have been on the jury. The State did not identify this witness for the record as the one whom Thomas had identified.

The issue at the trial was principally the factual controversy raised by Breshear's identification of defendant as one of the three men at the station, on the one hand, and Thomas' exoneration of the defendant on the other. The jury decided that issue, and we now rule the case upon its finding that defendant was present in and at the station under the circumstances related by Breshears.

 The sole point raised here by defendant is that the evidence was insufficient and that the court should have directed a judgment of acquittal. Counsel says that there was no direct evidence of defendant's participation, and that the circumstantial evidence was not inconsistent with the "reasonable theory of innocence" advanced by defendant, meaning, of course, the theory of his having picked up the hitchhikers. We hold that, while there was no direct evidence of defendant's actual participation in the robbery itself, there was direct evidence of his immediate presence at the time, from which the jury was entitled to draw an inference, if it so found, that he was aiding and abetting in the perpetration of the robbery. The jury was given an instruction on that subject to which no objection is made. Defendant's movements, his times of arrival and leaving, his immediate proximity at the time of the actual robbery, his apparent acquaintance with the robbers and his conversations with one or both of them, and indeed all of the circumstances created the basis for an entirely reasonable inference that defendant was acting in conjunction with the other two, as a lookout or otherwise.

Obviously counsel is urging the insufficiency of the circumstantial evidence showing that defendant was the driver of the car at the time of the arrest, and that it contained two of the actual robbers, the revolver, and all or part of the loot; this, of course, within a very few minutes after the robbery and within four blocks of the place where it occurred. Counsel relies almost entirely on the opinion of this court in the case of State v. Watson, Mo., 350 S.W.2d 763. There, a filling station in a rural area had been burglarized by two men who were seen in the darkness but were not identified. A car, answering the description of the robbery car, was stopped for a traffic violation some twelve to fourteen miles from the scene, about fifteen or twenty minutes later, and the loot from the station was found in the trunk and on the back seat. One Thomas was the driver and the defendant was a passenger on the front seat. Two loaded automatic pistols were found, one under each side of the front seat. Both men were arrested and charged with the burglary and theft. Thomas plead guilty and was sentenced; his passenger, the defendant, stood trial and was convicted. On appeal the conviction was reversed for insufficiency of the evidence. In that case there was no evidence whatever placing the defendant at the scene of the crime, and indeed no

evidence of any nature of his guilt except the fact of his presence in the car under the circumstances recited. Thomas, the driver, testified there that he had picked up the defendant as a hitchhiker after he left the scene of the burglary, and certain other more or less corroborating evidence was also offered and received. This court held, in substance, that the joint possession of the loot by Thomas and defendant, as indicated by their joint presence in the car, was insufficient *without more*, to raise an inference of guilt which would justify submission, particularly in view of the absence of any evidence of knowledge of the circumstances on defendant's part. The court also held that a mere "suspicion" of guilt is not sufficient to justify a conviction, citing State v. Matticker, Mo., 22 S.W.2d 647. There can be no argument about that. The court quoted with approval from 12 C.J.S. Burglary § 59b, pp. 736–738, which quotation contained the following statement: "'If possession is joint with another, there must be something else in the evidence to connect defendant with the offense; but possession by others may be sufficient if a conspiracy is shown.'" And further the court said, loc. cit. 350 S.W.2d 766: "That possession by others or a joint possession may be sufficient if a conspiracy or a common purpose to commit a crime is shown is apparent from the decisions of State v. Strait, Mo., 279 S.W. 109; State v. Dowling, 360 Mo. 746, 230 S.W.2d 691, 694 [4, 5]; and State v. Jordan, Mo., 235 S.W.2d 379, 382 [3, 4]."

There can be no doubt that in Missouri all who act together with a common intent in the commission of a crime are equally guilty. State v. Slade, Mo., 338 S.W.2d 802; State v. Johnson, Mo., 347 S.W.2d 220. In State v. Oliver, 355 Mo. 173, 195 S.W.2d 484, the court said, loc. cit. 486: "To create an inference of guilt, the term 'exclusive' does not mean that the possession must be separate from all others provided there is other evidence to connect defendant with the offense. 12 C.J.S.,

Burglary, § 59 subsec. b, p. 738; State v. Wyre, Mo.Sup., 87 S.W.2d 171. The facts here may indicate that more than one person committed the crime, but they are sufficient to authorize the jury to find that defendant was one of the guilty persons."

We conclude, as we have already indicated, that here there was *"other evidence"* of a substantial and direct character to connect defendant with the commission of the robbery, and that the court properly overruled the motion for a judgment of acquittal. This case is clearly distinguishable in that respect from our decision in the Watson case and that decision is not controlling.

The judgment is affirmed.

All of the Judges concur.